**KNOX GLASS BOTTLE CO. v. GOLDEN GATE LIQUOR CO., Inc., et al.**

**No. 16550.**

Court of Appeal of Louisiana. Orleans.
May 31, 1937.

Rittenberg & Rittenberg, of New Orleans, for appellant.

Prowell & McBride, of New Orleans, and Wm. M. Snyder, of Jackson, Miss., for appellee.

JANVIER, Judge.

Knox Glass Bottle Company, a Mississippi corporation, claiming to have sold and delivered certain bottles termed "decanters" to Golden Gate Liquor Company, Inc., a corporation domiciled in New Orleans, and that Herman Suffrin, prior to delivery and in writing, guaranteed payment of the account, seeks recovery from the liquor company and from Suffrin of the alleged price of the said bottles. Plaintiff, alleging also that a large part of the assets of the liquor company were transferred later to Suffrin for the fraudulent purpose of placing them beyond the reach of the creditors of the corporation and in order to give Suffrin an unfair preference as a stockholder and as a creditor, prays that the said transfer be set aside and that, by reason of the attempt to so transfer the assets, Suffrin be held personally liable for the debt due to plaintiff

and that the said assets be held to be subject to the common pledge of such creditors of the corporation as may not have been paid.

Defendants deny that the bottles, for the price of which judgment was sought, were ordered by the liquor company or delivered by plaintiff, and deny that the transfer by the liquor company of a portion of its assets to Suffrin was fraudulent, or that that transfer improperly affected the rights of plaintiff, and they especially deny that Suffrin guaranteed payment of the price of the particular bottles, the alleged sale of which forms the basis of this suit.

Below there was judgment for the major portion of the amount sued for in favor of plaintiff against Suffrin and the liquor company jointly and solidarily, but the demand for annulment of the transfer of the corporation's assets to Suffrin was denied. Suffrin appealed from the judgment against him and plaintiff answered the appeal praying that the judgment be increased to the amount originally prayed for and that it be also amended so as to annul and set aside the alleged transfer.

The first question which we shall consider is whether Suffrin guaranteed payment of the account.

On June 12, 1935, he, as president of the Golden Gate Liquor Company, Inc., signed and delivered to the representative of plaintiff company a letter reading as follows:

"June 12th, 1935.

"Knox Glass Bottle Co.
"Jackson, Miss.
"Gentlemen:—

"Please enter our order for the following:—

"50 gross Private Mould Decanters 1 doz. C $8.75
"50 gross Private Mould Decanters 1 doz. A 9.25

"Freight allowed to New Orleans.

"The above order is given with the understanding that should we order out during the year 1935 an amount to exceed 500 gross we are to own the Mould and same will be known as our private Mould. Should we order shipped in the year of 1935 an amount less than 500 gross it is understood that we have no claim on the ownership of the Mould and can be supplied to your regular trade.

"We also agree to cause Mr. H. Suffrin to guarantee payment of our account with you.

"Very truly yours,
"Golden Gate Liquor Company
"[Signed]   H. Suffrin, Pres."

"It is mutually agreed to that should the Golden Gate Liquor not order out the entire 500 gross in the year 1935 and pay the amount of fifty cents per gross on balance of 500 the said mould belongs to the said Golden Gate Liquor Co.

"Knox Glass Bottle Co.
"By [Signed]   C. R. Underwood."

At the same time he executed and delivered the guarantee referred to in the letter. It reads as follows:

"Know all men, that, in consideration of the making of a contract between Golden Gate Liquor Co., Inc. of New Orleans La. and Knox Glass Bottle Co., of Jackson, Miss and/or Knox Glass Associates, Inc. Oil City, Pa., for the supply of Glass Bottles, and for value received, I, H. Suffrin of New Orleans, La., do hereby guarantee to the said Knox Glass Bottle Co., and/or Knox Glass Associates, Inc., the payment of the account of the said Golden Gate Liquor Co., Inc. and I hereby waive notice of the non-payment of the said account by the said Golden Gate Liquor Co., Inc. and the failure of the collection of same.

"In Witness whereof, I have hereunto set my hand this 12th day of June 1935.
"[Signed]   H. Suffrin
"In presence of
"[Signed]   C. Horton Smith."

It will be noted that the letter is an unconditional order for 100 gross of bottles and it is conceded that, if any part of the price of those bottles had not been paid, Suffrin, under the guarantee, would have been liable therefor.

But it is not the price of those bottles which concerns us. The bottles which are here involved are others which plaintiff claims to have supplied on order as a part of the additional 400 gross to which the letter makes reference, and Suffrin contends that neither the letter nor the guarantee can be construed as an agreement on his part to be liable for more than the price of the order placed when the guarantee was executed. In other words, he maintains that the account which he guaranteed included only the order placed at that time and was not intended to include further purchases and that the additional 400 gross referred to in the letter were not ordered at that time, but were merely mentioned in connection with a separate agreement to the effect that, if they should be ordered, the purchaser should receive a certain concession.

Suffrin does not contend that no consideration was given for his guarantee, conceding that he is liable if the contract can be interpreted as including bottles other than those involved in the first 100 gross ordered and if it can be shown that other bottles were ordered and delivered.

█ We consider the contract of guarantee ambiguous in the sense that, from it alone, we are unable to determine whether the parties intended that it should refer only to the order which was placed simultaneously with its execution, or whether it was intended that it should include all purchases referred to in the letter written when the guarantee was executed. And, since we find the document ambiguous, it is necessary to resort to the circumstances and transactions surrounding its execution and to the acts of the parties to determine what they intended, and we bear in mind, at the outset, certain legal principles applicable to the interpretation of ambiguous written documents. First we note that both the letter which refers to the guarantee and the guarantee itself were written on letterheads of the plaintiff company and, from this and from other evidence, we conclude that they were prepared by the representative of said plaintiff company and we bear in mind what we said in Crescent Cigar & Tobacco Company v. Rizzuto, 15 La.App. 642, 132 So. 801, 802:

" * * * the contract was written by the plaintiff's officer. It follows, therefore, that any ambiguity or uncertainty therein must be construed against it."

We next note that article 3039 of our Civil Code obviously restrains us in interpreting such a contract and requires that we do not extend it beyond the intention of the parties, but, rather, that we limit it strictly in favor of the surety. That article reads as follows:

"Express agreement required—Strict construction of contract.—Suretyship can not be presumed; it ought to be expressed, and is to be restrained within the limits intended by the contract."

█ We find, also, much jurisprudence to the effect that the contract of the gratuitous surety should be interpreted strictly in his favor. In Home Insurance Company v. Voorhies Company, Inc., et al. (La.App.) 168 So. 724, 726, the court said:

"Suretyship is strictly construed; it must be restrained within the limits intended by the contract."

See, also, Texas Company v. Crais (La. App.) 155 So. 405; Continental Insurance Company v. Prevost et al. (La.App.) 154 So. 671; First National Bank of Arcadia v. White et al., 13 La.App. 156, 127 So. 433; Lachman & Jacobi v. Henry Block & Bro. et al., 47 La.Ann. 505, 17 So. 153, 154, 28 L.R.A. 255; Hunter Stewart v. Levis Bros., 42 La.Ann. 37, 6 So. 898; S. & L. Fasnacht v. Winkelman and Heuer, 21 La.Ann. 727; Diggs, McKeever & Co. v. S. G. Staples, 7 La.Ann. 653; Old et al. v. Fee, 8 Mart. (O.S.) 14; Hincks v. Hoffman and Schmedtje, 12 Orleans App. 218.

█ It is also well settled that there is a presumption that parties to such an agreement intended it to apply to an existing debt only and that it should not be construed as a continuing guarantee unless it is evident that they so intended. In Lachman & Jacobi v. Henry Block & Bro. et al., supra, the court said:

"One proposing to bind himself as surety for indebtedness future and past, and desiring to be understood, would hardly confine himself with the mere expression of agreeing to become surety, with no indication of the debt intended to be secured. On the other hand, the creditor seeking a surety for existing as well as prospective liability of his debtor would not deem the purpose accomplished by the scant agreement to become surety, with no debt mentioned, future or past."

In 28 Corpus Juris, at page 959, paragraph 109 (b), appears the following:

"Where a guaranty contains no express limitation as to either time or amount, and there is nothing in the instrument itself from which it can be inferred that it was the guarantor's intention to leave it open as to both, the guaranty will generally be understood as referring to a single transaction; and where no time is fixed during which the guaranty shall continue and nothing in the instrument indicates the continuance of the undertaking, the presumption is in favor of a limited liability as to time whether the amount of credit which may be obtained by the third person is limited or not."

And now, having indicated that it is well settled that we must construe this agreement as strictly in favor of the surety as the circumstances will permit, we point to circumstances—and to one in particular—which, we feel, show conclusively that Suffrin himself well understood that his guarantee was intended to include at least all purchases

made as the result of the letter of June 12 and that he well knew that, in writing that letter and in executing the guarantee, he bound himself for the payment of the price of all bottles included within the 500 gross mentioned therein.

That we may take into consideration the surrounding circumstances and the facts, to which we shall refer, to indicate that it was the guarantor's intention to so bind himself, is evident from a reading of a further portion of paragraph 109 (b) on page 959 of the 28th volume of Corpus Juris, for there it is said:

"Where, however, it is apparent from the language of the guaranty in connection with the surrounding circumstances existing at the time it was executed that it was the guarantor's intention to leave the time and amount open to cover a series of transactions, the guaranty will be construed as a continuing one; but the time and amount must be reasonable under the circumstances of the particular case."

The particular circumstance to which we have referred as most persuasive is the evidence of the interpretation which Suffrin himself placed upon his obligation. On August 27, 1935, he wrote to plaintiff corporation a letter reading as follows:

"I hereby notify you that all goods sold by you to the Golden Gate Liquor Co. Inc. after receipt of this letter will not be guaranteed by me."

At that time all of the bottles to which he admits his guarantee referred had been delivered, and, therefore, he could not, by writing the letter, limit his obligation so far as it concerned those bottles. And that, in writing that letter, he had no intention of limiting his obligation as to those bottles, is shown by the fact that, in a settlement which he at that time made with the liquor company, he assumed liability for and agreed to pay the unpaid portion of the purchase price of those bottles and it is conceded that he did pay the balance due for them. Why, then, should he write a letter attempting to terminate liability on an account which he had already agreed to pay and which later, without controversy, he did pay? Furthermore, the letter refers to goods "sold" by the bottle company "after receipt of this letter." At that time he well knew that all of the bottles included in the 100 gross order had been delivered—had been "sold"—long prior to the receipt of the letter, and, therefore, he could not possibly have had any

reference in that letter to those bottles. If there was no outstanding guarantee concerning other bottles than the original 100 gross, there was no necessity for writing such a letter, and, therefore, the fact that he wrote it indicates that he knew that his guarantee was still effective and that he should attempt to terminate it.

His counsel contends that the letter was a general one written to plaintiff and also to all other creditors of the liquor company, so that none of them would later deal with that company on faith in his connection with it. But that is not Suffrin's explanation, for he said that he wrote the letter because he was under the impression that some part of the original 100 gross had not yet been delivered.

There is, also, another letter sent by Suffrin to plaintiff on October 15, 1935, which shows plainly that at that time Suffrin had not conceived the defense that his guarantee did not include orders additional to the 100 gross. In this secondly referred to letter his sole contention was that the bottles, for the price of which this suit is brought, had not been delivered. He did not contend that his guarantee would not have included them had they been delivered. In this letter he stated that "there is no law available that will give you relief of my guarantee that is null and void for something that the Golden Gate has not even received." We think that these facts indicate that Suffrin knew that his guarantee was intended to include not only the original 100 gross, but any other bottles referred to in the letter of June 12th.

That the representatives of plaintiff corporation believed that the guarantee was not intended to be limited to the first 100 gross is evident because, without contradiction, it is shown that they had refused to sell to the liquor company without a guarantee of the account. They had refused in the past and, in fact, they refused to sell the first 100 gross referred to unless Suffrin should guarantee payment. It would have been strange indeed, after refusing to accept the smaller order without a guarantee, to agree shortly thereafter to deliver a much larger order with no guarantee, no security, and without yet having received payment for the smaller order. There is much evidence showing that the officials of plaintiff company did not have a high regard for the financial responsibility of the liquor company. It is shown that a previous order for jugs—smaller in price than the one involved

here—had been canceled because the glass company did not approve of the credit of the liquor company. In the testimony of Mr. Jerome G. Smith, New Orleans representative of the glass company, appears the following:

"Q. Do you know why your company did not deliver those jugs * * * ?

"A. They did not approve of the credit and wrote me to that effect * * * and I asked * * * for the payment in advance or the privilege to ship C. O. D. and he said to cancel the order."

He also stated that he had never sold to the liquor company without Suffrin's guarantee.

Mr. Chester R. Underwood, of Jackson, Miss., a vice-president of plaintiff company, testified that "they had no credit." "We would not extend them credit. * * * Our credit department would not extend them credit."

Mr. C. Horton Smith, another representative of plaintiff company in New Orleans, said: "Unless the account were guaranteed by a responsible party we could not sell them."

Mr. W. M. Snyder, another vice-president of plaintiff company, testified that he instructed the credit manager "not to allow shipment of any bottles" and he further said "unless we got a guarantee or a certified check in advance there would be no bottles shipped." He further said that his company "would not have sold them a nickle's worth without Mr. Suffrin's guarantee."

Defendants call attention to the fact that on the order blank for the first 100 gross of bottles prepared by the local representative of plaintiff there appeared the statement, "account guaranteed by Mr. H. Suffrin," whereas, on the order blank covering the 200 gross on which this suit is based, there was no such statement, and they maintain that this indicates that the local representative who prepared the blanks understood that the second order had not been guaranteed by Mr. Suffrin. In view of the facts to which we have just above referred, we attribute the omission from the second order blank of reference to the guarantee only to an oversight on the part of the clerk who prepared it. The first order blank was prepared simultaneously with the execution of the guarantee, whereas later, when the second order blank was prepared, the guarantee had been executed for some time and was, therefore, not uppermost in the mind of the clerk, who, consequently, made no reference to it in the order blank itself.

We readily conclude that it was the intention of the parties to give and to receive a guarantee of payment for all bottles contemplated in the letter of June 12th and that, consequently, Suffrin is responsible for such amounts as remain unpaid on the purchase price of all bottles included within the 500 gross referred to in that letter.

Without finding it necessary to refer in detail to the evidence on the subject, we find it well established that, on orders of the liquor company, there were tendered for delivery, or actually delivered, in addition to the first 100 gross of bottles, 195⁵⁄₁₂ gross at $8.75 per gross, and the district court so found. Even if there was any doubt on this question of fact, we could not reverse the finding of the court, since the evidence shows conclusively that there is no manifest error in that finding. The record shows that, in addition to the first 100 gross, 200 gross were ordered, and, while there is no controversy over the fact that only 195⁵⁄₁₂ gross were supplied on the order for 200 gross, the explanation is that it is the custom of the trade in the bottle business to stop the run of the "lehr" at certain points in the manufacture of bottles and that sometimes there is a small "underage" or "overage" and that it is always understood that the charge will be made for the actual amount delivered, although the quantity delivered may be infinitesimally less than the quantity ordered.

Plaintiff maintains that the judgment based on the 195⁵⁄₁₂ gross should be increased by 50 cents per gross by reason of the fact that it was understood that to the price offered should be added 50 cents per gross to cover the "mould" charge. The evidence clearly establishes such a custom and, furthermore, the letter of June 12th obviously refers to the fact that there would be an additional charge of 50 cents per gross which should be added to the contract price.

We find, then, that as against Suffrin, since the plaintiff has answered the appeal, the judgment should be increased to $1,807.58.

Plaintiff maintains that, in addition to the judgment against Suffrin, we should also decree as null and void the alleged transfer by the liquor company of the greater portion of its assets.

The record shows that, during the latter part of August, 1935, when Suffrin was the owner of one-half of the capital stock of the liquor company and when the company was also indebted to him, it transferred to him, in exchange for his shares of stock, in liquidation of the indebtedness and in consideration of his assumption of certain debts of the corporation, practically all of its liquid assets. It appears that, among the debts which he assumed, was that for the balance admittedly due to plaintiff on the original 100 gross of bottles.

Plaintiff condemns the transaction as being in fraud of those creditors whose claims were not assumed by Suffrin, alleging that, by the transaction, the corporation was stripped of its liquid assets and left, from a practical point of view, insolvent. In contending that the said transfer should be set aside, plaintiff relies upon articles 1968, 1969, and 1970 of our Civil Code, which afford to a victimized creditor the right to annul a fraudulent transfer and to have the transferred property subjected to the "common pledge of the creditors."

We find many authorities which recognize the right for which plaintiff contends. In Lovell v. Payne, 30 La.Ann. 511, the court said:

"Every fraudulent act of a debtor, no matter what its form, may be attacked by any creditor who has been prejudiced by it."

In Bullard v. Nattin, 18 La.App. 75, 137 So. 551, 553, it is said that:

"Sale to pay one creditor, even ignorant of debtor's insolvency, is fraud on other creditors, though grantee act in utmost good faith."

The Supreme Court, in Newman v. Baer, 50 La.Ann. 323, 23 So. 279, said:

"An insolvent debtor cannot give in payment to one creditor, to the prejudice of the other creditors, any other thing than the sum of money due. * * *

"Any machination or contrivance by which a fraudulent preference is sought to be given will be set aside and annulled."

More than 100 years ago, in Taylor v. Knox, 2 La. 16, the Supreme Court recognized the right of the defrauded creditor to attack such a transfer in the following words:

"A sale of property by a debtor who has not sufficient means to pay all his debts, made to one set of creditors, will be considered in fraud of the rights of the remaining creditors, and will be annulled and set aside, though made in ignorance on the part of the vendees, as to approaching insolvency, and in all other respects executed with the utmost good faith."

The theory underlying the doctrine is fully discussed in Southland Ins. Co. v. Michcl (La.App.) 149 So. 177, 179, in which the court said:

"The questions of good faith, knowledge of insolvency of the debtor, and innocent motives on the part of the grantee in a dation en paiement from an insolvent debtor are not material to a correct determination of the legal status of such a transaction. Under the plain language of article 2658 of the Civil Code, quoted above, the insolvent debtor is inhibited to give his property to a creditor 'to the prejudice of the others' (creditors). The natural sequel to the giving in payment by an insolvent to one creditor to discharge an unsecured obligation is injury and prejudice to the other unsecured creditors. Such act of necessity gives an unfair preference to the creditor thus favored, and, in the eyes of the law, amounts to legal and constructive fraud. The property of a debtor being the common pledge of all his creditors, it would be highly unjust and inequitable for one to be permitted to receive in payment any part of the assets of the common debtor in preference to other creditors. And, in this connection, the law does not require that fraudulent motives on part of the debtor, as a fact, shall be proved in order to strike with nullity a giving in payment by him. The act itself, which works prejudice and injury to other creditors, in legal contemplation superinduces constructive or legal fraud as a motivating cause of the transaction.

" 'The word fraud used in the foregoing article means any unfair preference which the debtor may give to one of his creditors over the others, by selling or mortgaging to him a portion of his property for a debt existing before the contract.' Civ.Code, art. 3360."

In defense of the transaction Suffrin contends that the corporation remained amply solvent even after he had taken over the assets and he maintains that such a transfer may not be attacked where the assets remaining in the possession of the corporation are ample to pay its remaining debts; in other words, that such a transaction may not be attacked where the corporation remains solvent.

Counsel for plaintiff concedes that insolvency is an essential prerequisite to the revocatory action. This principle, well established, results from article 1971 of the Civil Code, which, referring to the revocatory action, provides that:

"This action can only be exercised when the debtor has not property sufficient to pay the debt of the complaining creditor."

But plaintiff maintains that the record conclusively shows insolvency and that, at any rate, where there are shown to be unpaid debts, the burden of showing solvency rests upon those who defend the transfer, and this rule of law is expressly set forth in article 1985 of the Code, which provides, inter alia, that " * * * if he, who alleges the insolvency shows the amount of debts, it is incumbent on the other party to show property to an equal or greater amount." Plaintiff here has shown plainly the unpaid debt and that is sufficient to place upon Suffrin the burden of showing solvency. In attempting to do so, he points to various items which appeared in the inventory of assets remaining in the corporation after the transfer. Among those items was one rather large one, "Accounts Receivable in New Orleans $3,329.00," but nothing is shown as to the nature of those accounts receivable, nor as to whether, though receivable, they are collectible.

We quite agree with what our brothers of the Second circuit said in Southland Ins. Co. v. Michel, supra:

"It is well known that open accounts of an insolvent concern have very little value as assets. Collection thereof is extremely doubtful and difficult in normal times. At present, collection of accounts due a failing company, especially those of long standing, is virtually an impossibility. The facts of this case do not, in our opinion, remove the accounts due the Triangle Machine Company from the general rule.

"We do not think third opponent has met and discharged the burden of proof required by article 1985 of the Civil Code, and that the Triangle Machine Company was insolvent when the datien en paiement was made. Injury to other creditors followed as a natural result."

It is also interesting to note that, although, among the assets, there was listed "auto equipment $1,303.37," Mr. Rosen, the other stockholder who, in effect, remained the sole owner of the corporation, could not remember how many automobiles there were, nor their "kind," nor "model." Also, among the "assets" remaining in the corporation was an item set forth as "inventory in Atlanta, $6,931.46." Aside from the fact that the articles represented in this inventory, being in another state, were rendered difficult to execute upon, no details are given as to the articles which made up the said "inventory."

But, as evidence of the insolvency of the corporation after the transfer, we find two facts which we deem unanswerable. One is that plaintiff found it impossible to secure payment of the judgment which was rendered in the district court and which has now become final, and the other is that, though a check for $444 was alleged to have been deposited in the district court together with the answer which admitted an indebtedness of that amount, the check was not deposited for the reason, as stated in the record, that "when the time came to deposit this $444.00, as stated in the petition, the corporation stated that they did not have it." It also appears that, although the corporation claimed to have $419.86 in cash in a bank in Atlanta, its account in the New Orleans bank was overdrawn to the extent of $479.00.

Further analysis of the figures and facts is not necessary to show that when the transfer was completed the corporation had been rendered hopelessly insolvent, had been stripped of all of its liquid assets, and that there was no reasonable possibility that plaintiff could secure from it payment of the judgment debt. It follows that the transfer must be annulled to the extent of subjecting to the claim of plaintiff the assets which may still be located and identified.

It is unnecessary that we consider whether there has been a violation of the general corporation statute, Act No. 250 of 1928, as amended, which has rendered Suffrin, as one of the directors, personally liable to plaintiff. He is liable personally by reason of his guarantee, and the assets are subject to seizure under the judgment against the corporation by reason of the annulment of the pretended transfer. Nothing more is necessary.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is amended by increasing the amount thereof to $1,807.58, and, to the extent that the judgment appealed from rejected plaintiff's demand for the annulment of the pretended transfer, the said judgment is annulled, avoided, and reversed, and it is

now ordered adjudged, and decreed that the pretended transfer from Golden Gate Liquor Company, Inc., to Herman Suffrin be and it is annulled and set aside, and that the assets transferred be and they are subjected to the claim of plaintiff.

All costs to be paid by defendant.

Amended and affirmed in part, reversed in part.